2001-NMCA-025

24 P.3d 776

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Colin GONZALES, Defendant–Appellant.**

No. 20,998.

Court of Appeals of New Mexico.

March 26, 2001.

Certiorari Granted, No. 26,902, May 9, 2001.

Patricia A. Madrid, Attorney General, M. Victoria Wilson, Ass't Attorney General, Santa Fe, NM, for Appellee.

Phyllis H. Subin, Chief Public Defender, Carolyn R. Glick, Ass't Appellate Defender, Santa Fe, NM, for Appellant.

## OPINION

PICKARD, Chief Judge.

{1} Defendant appeals his adult sentence as a consequence of the trial court's findings that he was not amenable to treatment as a juvenile or eligible for commitment to an institution for the mentally disordered or developmentally disabled pursuant to NMSA 1978, § 32A–2–20 (1996). Defendant argues that the state and federal constitutions require the State to prove these findings to a jury beyond a reasonable doubt before a court may exercise its discretion to sentence a child as an adult. In support of his federal constitutional argument, Defendant relies on *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), in which

the Supreme Court struck down a New Jersey law that allowed a court to increase a maximum criminal sentence based on facts not found by a jury beyond a reasonable doubt. In addition to his constitutional claims, Defendant argues that, whatever the applicable burden of proof, the evidence was insufficient to support the trial court's findings. We hold that (1) the *Apprendi* decision is inapplicable to the findings required by Section 32A-2-20(B), (2) the state constitution does not require the State to prove non-amenability or ineligibility for commitment by proof beyond a reasonable doubt, and (3) substantial evidence supported the trial court's findings that Defendant was not amenable to treatment as a child or eligible for commitment. We therefore affirm.

## I. FACTS AND PROCEDURAL HISTORY

{2} Defendant turned fourteen years old on December 14, 1996. On March 13, 1997, after breaking into and vandalizing several other houses, Defendant and an accomplice broke into and ransacked Victim's home while Victim and his wife were away. The two juveniles shot Victim's dog with a .22 caliber rifle, which they had stolen from another house. In addition, Defendant took a .30-30 rifle from a wall in Victim's home and fired several rounds into a wall.

{3} When Victim and his wife returned home with their neighbors, they were alarmed to find that their dog had been shot while tied up in the yard. Victim went inside the house to call the police. The phone was next to a window outside of which Defendant and his accomplice were hiding. Defendant saw Victim, and assuming that Victim had likewise seen him, shot Victim in the chest with the .30-30 rifle. The accomplice then shot Victim in the head "to put him out of his misery."

{4} Around the time that Victim was killed, Victim's wife went inside the house. She saw her husband's body and begged the boys not to kill her. One of the boys told her to give them money and the keys to a truck or they would kill her as well. Wife told them that she did not have any money or the keys. The boys then searched Victim's body,

and Wife left the house in search of the neighbors. The boys came out of the house and fired 18 to 22 shots toward Wife and the neighbors. One of the neighbors was hit either by bullet fragments or fragments from a nearby car. The shot that hit the neighbor was fired from the .30-30 rifle that Defendant had stolen from Victim's home. At the time of his arrest, Defendant told the arresting officer that he had shot at the neighbor from about one-half mile away and that it was "a hell of a good shot" but "nothing to be proud of."

{5} Defendant pleaded guilty to second degree murder, aggravated burglary, aggravated battery, and two counts of aggravated assault. Pursuant to Section 32A-2-20(A), the prosecutor had earlier filed a notice of intent to seek an adult sentence. At the amenability hearing, Defendant called eight witnesses, three of whom were experts. The expert witnesses agreed that, at the time of the murder, Defendant was suffering from a variety of mental disorders. These witnesses also testified that Defendant was amenable to psychiatric treatment. Nonetheless, the trial court found, by clear and convincing evidence, that Defendant was not amenable to treatment as a child and was ineligible for commitment to an institution, and exercised its discretion under Section 32A-2-20(A) to sentence Defendant to 22 years in an adult correctional facility. Defendant then moved for a reconsideration of the adult disposition based on recommendations made in a presentence report ordered by the court, arguing that the court's findings needed to be based on proof beyond a reasonable doubt. The court denied Defendant's motion for reconsideration, after stating that it was persuaded beyond a reasonable doubt.

## II. DISCUSSION

### A. Preservation

■ {6} In its answer brief, the State argues that Defendant failed to preserve his argument that the "beyond a reasonable doubt" standard applies to the findings required by Section 32A-2-20(B). In support of its claim, the State argues that by submitting proposed findings of fact and conclusions

of law that presented "clear and convincing" as the applicable standard, Defendant abandoned his argument for the higher standard and invited the error. We disagree.

{7} To properly preserve an issue for appeal, a defendant must fairly invoke a ruling or decision by the trial court. Rule 12–216(A) NMRA 2001; *State v. Aragon*, 1997–NMSC–062, ¶ 7, 124 N.M. 399, 951 P.2d 616. The purpose of the preservation rule is to insure that the trial judge is alerted to the issue and has an opportunity to address it. *See State v. Coffin*, 1999–NMSC–038, ¶ 23, 128 N.M. 192, 991 P.2d 477. After reviewing the record, we conclude that the trial court was alerted to Defendant's argument for application of the "beyond a reasonable doubt" standard and had an opportunity to address it.

{8} On the first day of the amenability hearing, Defendant argued that the State was required to prove non-amenability and ineligibility for commitment beyond a reasonable doubt. Defendant then proffered proposed findings of fact and conclusions of law which advocated application of the "clear and convincing" standard of proof and argued to a like effect during closing arguments. After the trial court found Defendant non-amenable to rehabilitation and ineligible for commitment, Defendant filed a motion for identification of the standard of proof used by the court in its decision. In his motion, Defendant renewed his argument that the proper standard was beyond a reasonable doubt. Nonetheless, the trial court ruled that, as a matter of law, the proper standard was "clear and convincing" evidence:

> I made my ruling based on the clear and convincing evidence argument that you [Defense counsel] made to me. I still think that's the appropriate standard. However, upon receiving your motion, I considered the proof beyond a reasonable doubt.... I'm going to rule that the standard is the clear and convincing. But I'm also going to state that even if it were the proof beyond a reasonable doubt, I've reflected on that also and I'm satisfied that it would meet that standard if that were the standard.

{9} The case at bar is distinguishable from the cases relied upon by the State in its answer brief. In *State v. Campos*, 122 N.M. 148, 921 P.2d 1266 (1996), for example, our Supreme Court held that the defendant had abandoned his claim because he voluntarily stopped questioning the witness he later claimed he wanted to question. *See id.* at 161, 921 P.2d at 1279. In this case, in contrast, Defendant renewed his argument for application of the "beyond a reasonable doubt" standard in the motion for reconsideration and the subsequent hearing. Although the trial court did earlier apply the "clear and convincing" standard at the request of Defendant, the court indicated that it considered the arguments for the higher standard and rejected them in favor of the "clear and convincing" standard.

{10} In addition, there is no suggestion in the record that either the court or the State were prejudiced by Defendant's reintroduction of the "beyond a reasonable doubt" argument after the court had made its ruling. The court was able to apply the higher standard to the facts and render a judgment without the need of further hearings. Finally, the State does not claim that it would have presented a different case had it known the court would apply the higher standard. Therefore, we hold that Defendant preserved his constitutional claims and will address the issues on the merits.

**B. Constitutional Arguments**

{11} Defendant argues that the federal constitution, as described in *Apprendi*, requires that the Section 32A–2–20(B) findings be made by a jury beyond a reasonable doubt. In addition, Defendant argues that the state constitution requires the application of the beyond a reasonable doubt standard, based on a comparison with other provisions of the Delinquency Act. In analyzing Defendant's claims, this Court applies the interstitial approach outlined in *State v. Gomez*, 1997–NMSC–006, 122 N.M. 777, 932 P.2d 1. We first ask whether the right being asserted is protected under the federal constitution. *Id.* ¶ 19. If it is, the state constitutional claim is not reached. If the right is not protected under the federal constitution, we

must then analyze whether the State constitution provides broader protection. *See id.* We may diverge from federal precedent for three reasons: (1) the federal analysis of the issue is flawed, (2) distinctive state characteristics require a different result, or (3) the federal analogs are undeveloped. *See id.*

### 1. Background

{12} Before addressing Defendant's constitutional arguments, it is necessary to put the issue before us in context. We therefore begin by briefly reviewing the history and purpose of New Mexico's Delinquency Act, NMSA 1978, §§ 32A–2–1 to –33 (1993, as amended through 1996), as it relates to Defendant.

{13} The juvenile justice system is primarily concerned with the rehabilitation of children, although accountability, deterrence, and protection of the public are important goals. *See* § 32A–2–2 ("The purpose of the Delinquency Act [this article] is … consistent with the protection of the public interest, to remove from children committing delinquent acts the adult consequences of criminal behavior, but to still hold children committing delinquent acts accountable for their actions … and to provide a program of supervision, care and rehabilitation…."). In the hopes that rehabilitation will be successful, the juvenile system suspends some of the long term consequences of criminal behavior. *See* § 32A–2–18(A) ("A judgment in proceedings on a petition under the Delinquency Act [this article] resulting in a juvenile disposition shall not be deemed a conviction of crime nor shall it impose any civil disabilities ordinarily resulting from conviction of a crime…."). The juvenile system also provides a flexibility in commitment procedures to allow the Children, Youth and Family Department (CYFD) to meet the rehabilitative goals of the Act. *See State v. Adam M.,* 2000–NMCA–049, ¶ 9, 129 N.M. 146, 2 P.3d 883. For example, while a criminal sentence is fixed in duration, a long-term commitment under the Delinquency Act is indeterminate and may be extended if required. *See* § 32A–2–23(D); *see also Adam M.,* 129 N.M. 146, 2 P.3d 883, 2000–NMCA–049, ¶ 9. In addition, a child commit-

ted under the Act must be released before the term of the commitment expires if the rehabilitative purposes of the commitment have been met. *See* § 32A–2–23(C).

{14} Since the creation of the juvenile justice system, however, the Legislature has recognized that, given finite resources and the time constraints imposed by the limited jurisdiction of the children's court, the system cannot rehabilitate some children who commit serious crimes. *See, e.g.,* § 32A–2–20(D), (E) (stating that child may be committed up to age twenty-one). Where evidence shows that a child will not benefit from the structure of rehabilitation or that the danger the child poses to the community outweighs the possible benefits of treatment within the juvenile system, the law has traditionally allowed a child to be transferred to the district court for prosecution as an adult. *See, e.g.,* 1955 N.M. Laws, ch. 205, § 9 (allowing juvenile court to transfer juveniles over the age of fourteen years to district court for prosecution if juvenile charged with felony is found "not a proper subject for reformation or rehabilitation").

{15} Prior to 1993, New Mexico maintained a system of transfer that was similar to systems developed within the federal and other state governments. However, the 1993 amendments to the Children's Code created a new system that is unique in this country. Whereas most jurisdictions have maintained provisions allowing a court to waive or transfer juvenile court jurisdiction, New Mexico has chosen to abolish the transfer system in favor of vesting the children's courts with the authority to sentence youthful offenders as adults. *See* Patricia Torbet, et al., *Juveniles Facing Criminal Sanctions: Three States That Changed the Rules* (2000) <http://ojjdp.ncjrs.org/pubs/court.html# 181203>. Although the form of the statute may be different, the purpose and effect remain the same.

{16} In 1993, the Legislature created three "classes" of juvenile offenders: serious youthful offenders, youthful offenders, and delinquent offenders. *See* §§ 32A–2–3(C), (H), (I). These classifications reflect the rehabilitative purpose of the Delinquency Act, coupled with the realization that some juve-

nile offenders cannot be rehabilitated given the limited resources and jurisdiction of the juvenile justice system. *See* § 32A–2–2(A) (stating purpose of Act). Serious youthful offenders, namely children fifteen years or older charged with committing first degree murder, are excluded from the jurisdiction of the children's court unless found guilty of a lesser offense. *See* § 32A–2–3(H). Given the age of these offenders and the seriousness of the offense, including the requisite intent, the Legislature has determined that serious youthful offenders cannot be rehabilitated using existing resources in the time available. At the other end of the spectrum is the class of delinquent offenders, which includes all children under the age of fourteen, and children over the age of fourteen years who have been adjudicated guilty of less than four felonies in three years or have not been found guilty of an unenumerated offense. *See* § 32A–2–3(C). Given a delinquent child's young age or lack of a serious criminal history, the Legislature has determined that existing services and facilities most likely can rehabilitate these children within the time available. Under these circumstances, there is time to gauge progress, adjust treatment plans, and extend commitment if necessary. *See* § 32A–2–23 (describing modification, termination, or extension of disposition).

{17} The class of youthful offenders to which Defendant belongs includes children fourteen years or older who are adjudicated guilty of any one of twelve enumerated violent felonies or who have three prior felony adjudications in the previous three years in addition to their current felony offense, as well as children fourteen years of age who are adjudicated guilty of first degree murder. *See* § 32A–2–3(I). For these offenders, the determination of amenability to rehabilitation within the juvenile system is a more complicated question. Under the Delinquency Act, youthful offenders are entitled to be sentenced within the juvenile system unless the court makes the findings required by Section 32A–2–20(B). The provisions of Section 32A–2–20 apply if the prosecutor has filed an intent to seek an adult sentence and the child has been adjudicated guilty. *See* §§ 32A–2–20(B), 32A–2–3(I). Under Section 32A–2–20(B), a trial court has the discretion to sentence a youthful offender as an adult only if the court finds that "the child is not amenable to treatment or rehabilitation as a child in available facilities," and "the child is not eligible for commitment to an institution for the developmentally disabled or mentally disordered." In making these findings, a court is required by Section 32A–2–20(C) to consider the following factors:

(1) the seriousness of the alleged offense;

(2) whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner;

(3) whether a firearm was used to commit the alleged offense;

(4) whether the alleged offense was against persons or against property, greater weight being given to offenses against persons, especially if personal injury resulted;

(5) the sophistication and maturity of the child as determined by consideration of the child's home, environmental situation, emotional attitude and pattern of living;

(6) the record and previous history of the child;

(7) the prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the child by the use of procedures, services and facilities currently available; and

(8) any other relevant factor, provided that factor is stated on the record.

{18} If the court finds that a child is neither amenable to treatment as a child nor eligible for commitment, the court may impose either a juvenile disposition or an adult sentence. *See* § 32A–2–20(A). The findings trigger the court's discretion; they do not require the court to sentence a juvenile as an adult. By contrast, a finding of either amenability to rehabilitation or eligibility for commitment restricts the court's range of possible dispositions to those available within the juvenile system. *See* § 32A–2–20(B), (E).

{19} Although the consequences of the determination that a youthful offender is non-amenable to treatment and ineligible for

commitment may be severe in that sentences under the Criminal Code are typically longer than commitments under the Delinquency Act, *compare* § 32A–2–20(E) *with* NMSA 1978, § 31–18–15 (1999), the purpose of the amenability hearing is not to punish a child or to increase the punishment, but rather to gauge the possibility for meaningful rehabilitation. The amenability hearing is a proceeding separate from both the adjudication of guilt and disposition or sentencing. A child may be found non-amenable to treatment or rehabilitation, yet the court may exercise its discretion by entering a disposition within the juvenile system. Similarly, a child may be found non-amenable and be sentenced as an adult, yet be given adult probation rather a sentence of incarceration. *See generally* Torbet, *supra*, at 23 (discussing sentencing of youthful offenders in New Mexico).

{20} With these considerations in mind, we now turn to Defendant's constitutional arguments. The issues presented by this case are whether the due process clause of the *Fourteenth Amendment to the United States Constitution* requires that the Section 32A–2–20(B) findings be made by a jury beyond a reasonable doubt or whether Article II, Section 4 of the New Mexico Constitution requires that the findings be made by the court pursuant to a reasonable doubt standard.

### 2. *Apprendi*

{21} Defendant does not argue that federal law decided prior to *Apprendi* compels the application of the "beyond a reasonable doubt" standard to the Section 32A–2–20 findings. To the contrary, prior to *Apprendi*, most federal courts that have squarely addressed this issue hold that the proper standard for transfer is preponderance of the evidence. *See United States v. Parker*, 956 F.2d 169, 171 (8th Cir.1992); *United States v. T.F.F.*, 55 F.3d 1118, 1122 (6th Cir.1995); *United States v. A.R.*, 38 F.3d 699, 703 (3rd Cir.1994); *United States v. Doe*, 49 F.3d 859, 868 (2d Cir.1995); *but see United States v. M.L.*, 811 F.Supp. 491, 493–94 (C.D.Cal.1992) (applying clear and convincing standard to decision to transfer child to adult criminal court).

{22} In *Apprendi*, the Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 120 S.Ct. at 2362–63. After the defendant there pleaded guilty to second degree possession of a firearm, the prosecutor filed a motion seeking to enhance the sentence under the New Jersey "hate crimes" law. *See id.* at 2351. The law provided for an extended term of imprisonment if the trial court found, by a preponderance of the evidence, that the defendant acted with the purpose to intimidate an individual or group because of an impermissible bias. The trial court found that the defendant had acted with racial bias and imposed a twelve-year sentence, which was two years longer than the maximum sentence allowed for a second degree felony. *See id.* at 2352. The Supreme Court reversed the sentence, holding that the hate crime statute defined an element of a criminal offense and, as such, due process required that a jury find beyond a reasonable doubt that the defendant acted with the purpose to intimidate. *See id.* at 2364–66.

{23} Defendant argues that the *Apprendi* decision applies to the amenability determination, given the fact that the Section 32A–2–20(B) findings are necessary to expose a youthful offender to the possibility of an adult sentence. Defendant argues that the consequences of sentencing as an adult in terms of both the length of incarceration and removal of the protections of the juvenile system render the amenability determinations more like elements of a crime than sentencing factors. We disagree. We conclude that accepting Defendant's argument would require an overly broad interpretation of *Apprendi* that is unsupported by the Court's reasoning.

{24} By way of introduction, we note that a determination that a child is not amenable to treatment within the juvenile system differs from findings related to the elements of crime in three significant ways. First, while findings of guilt are measures of the degree of an individual's criminal culpability, the finding that a child is or is not amenable to

treatment is a measure of a child's prospects for rehabilitation. Second, while findings of guilt are based on historical facts susceptible of proof beyond a reasonable doubt, a finding that a child is not amenable to rehabilitation requires a prediction of future conduct based on complex considerations of the child, the child's crime, and the child's history and environment. Third, a determination of amenability or eligibility for commitment requires some foreknowledge of available facilities and the programs in them that trial judges who make sentencing decisions every day have, while juries do not.

{25} Whether ultimately given a juvenile disposition or an adult sentence, every youthful offender has the constitutional right to the State's proof of every element of a criminal offense beyond a reasonable doubt. *See Apprendi*, 120 S.Ct. at 2366; *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). By contrast, whatever right a child may have to be treated as a child within the juvenile justice system is a statutory, not a constitutional, right. *See Kent v. United States*, 383 U.S. 541, 547–48, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966). The United States Supreme Court has drawn a clear line between the process due during an adjudication of delinquency or guilt and the lesser process due during an amenability hearing. *Compare In re Winship*, 397 U.S. at 365, 90 S.Ct. 1068 ("The same considerations that demand extreme caution in fact-finding to protect the innocent adult apply as well to the innocent child."), *with Kent*, 383 U.S. at 562, 86 S.Ct. 1045 (holding that amenability hearings "must measure up to the essentials of due process and fair treatment"), *and Breed v. Jones*, 421 U.S. 519, 537, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975) ("The [Supreme] Court has never attempted to prescribe criteria for, or the nature and quantum of evidence that must support, a decision to transfer a juvenile for trial in adult court."). The determination of a youthful offender's amenability to treatment within the juvenile system is a question of the prospects for rehabilitation of the child, not of the degree of a child's criminal culpability. The constitutional concerns expressed by the Supreme Court in *Winship* and *Apprendi* are satisfied by the jury's finding beyond a rea-

sonable doubt that a child committed the offenses that form the foundation permitting the court to sentence the child as an adult.

{26} The second difference between the Section 32A–2–20(B) findings and the elements of a crime is in the nature of the findings. The determination of a child's prospects for rehabilitation is a complicated and difficult question that requires consideration of a child's environment, age, maturity, past behavior, and predictions of future behavior as well as specifics of the offense as they relate to the prospects of rehabilitation. Unlike the finding that a child has committed a criminal offense, the finding that a child is not amenable to treatment as a child within the juvenile system requires a predictive, more than historical, analysis.

{27} As such, a finding of non-amenability is different in nature from the type of findings discussed in *Apprendi*. Whether a defendant acts with the intention to intimidate another based on prejudice or bias is a fact susceptible to proof beyond a reasonable doubt. *See Apprendi*, 120 S.Ct. at 2355. On the other hand, amenability or eligibility for commitment are not as susceptible to proof by this high standard. As the Supreme Court noted in *Addington v. Texas*, 441 U.S. 418, 429, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979):

> [T]he initial inquiry in a civil commitment proceeding is very different from the central issue in either a delinquency proceeding or a criminal prosecution. In the latter cases the basic issue is a straightforward factual question—did the accused commit the act alleged? There may be factual issues to resolve in a commitment proceeding, but the factual aspects represent only the beginning of the inquiry. Whether the individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the *meaning* of the facts which must be interpreted by expert psychiatrists and psychologists. Given the lack of certainty and the fallibility of psychiatric diagnosis, there is a serious question as to whether a state could ever prove beyond a rea-

sonable doubt that an individual is both mentally ill and likely to be dangerous.

{28} Additionally, a court, which has regular exposure to both the criminal and juvenile systems, is in a much better position to determine an individual child's amenability to treatment within existing programs. In their day-to-day interactions with sentencing decisions, presentence reports, probation violations, and the whole range of criminal and juvenile justice issues, trial courts become knowledgeable about the basic considerations governing appropriate dispositions for offenders.

{29} With the foregoing as background, the important point is that the reasoning of the *Apprendi* decision itself supports our result. In reaching its holding, the Court distinguished and upheld trial courts' traditional discretion to consider factors relating both to the offense and the offender in imposing a sentence within the range set by statute. *See id.* at 2358. The Court also distinguished its holding from cases dealing with fact-finding in capital sentencing on the grounds that it is the jury's verdict of guilty of first degree murder that exposes a defendant to the possibility of a death sentence. *See id.* at 2366. The Court adopted the position that

> "[o]nce a jury has found the defendant guilty of all the elements of an offense which carries as its maximum penalty the sentence of death, it may be left to the judge to decide whether that maximum penalty, rather than a lesser one, ought to be imposed.... The person who is charged with actions that expose him to the death penalty has an absolute entitlement to jury trial on all the elements of the charge."

*Id.* (quoting *Almendarez–Torres v. United States,* 523 U.S. 224, 257 n. 2, 118 S.Ct. 1219, 140 L.Ed.2d 350 (Scalia, J., dissenting)).

■ {30} The test for determining whether a particular fact is a sentencing factor or an element of the crime "is one not of form, but effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" *Apprendi,* 120 S.Ct. at 2365. This test is not merely whether a particular finding may result in a greater sentence than would have occurred without the finding, but whether the finding sets the maximum sentence to which a defendant may be subjected.

■ {31} While a finding of non-amenability and ineligibility for commitment may expose a youthful offender to a longer period of deprivation of liberty than is possible under the Children's Code, only two factual findings are required to expose a child to the possibility of adult sentencing: (1) the child's age at the time of the offense and (2) the jury's verdict or a plea of guilty to a specifically enumerated felony or to any felony, provided it is in fact the child's fourth felony in three years. Under Section 32A–2–20(D), if the court invokes an adult sentence, the sentence may be "less than, but shall not exceed, the mandatory adult sentence." Therefore, at the time the child pleads or is adjudicated guilty of an offense, the range of possible sentences is fixed. In this case, the finding of non-amenability and ineligibility for commitment did not expose Defendant to a first degree sentence for a second degree crime as was the case in *Apprendi.* We note that the plea agreement signed by Defendant prior to the amenability hearing included the range of juvenile dispositions as well as the adult sentences applicable to the crimes committed. Under no circumstances do the Section 32A–2–20(B) findings result in the child being found guilty of or sentenced for a greater offense. Furthermore, no child will be subject to the possibility of sentencing as an adult if, at the time of the finding of guilt, the child does not meet the statutory definition of a youthful offender under Section 32A–2–3(I).

{32} In conclusion, we hold that *Apprendi* is inapplicable to the Section 32A–2–20(B) findings.

### 3. State Constitution

■ {33} New Mexico cases have never articulated the standard of proof pursuant to which the findings required by Section 32A–2–20 are to be made. Prior versions of the children's code statutorily established the very low standard of "reasonable grounds to believe" that the enumerated crime was com-

mitted and required simple consideration of whether the child was amenable to treatment as a juvenile. *See State v. Doe*, 103 N.M. 233, 238–40, 704 P.2d 1109, 1114–16 (Ct.App. 1985). Under the current statute, the trial court must make a specific finding that the child is not amenable. Whatever the current standard of proof is for the trial court to make this specific finding, whether it is pre-ponderance of the evidence as advocated by the State or something higher, we review the trial court's decision for substantial evidence, *see In re Ernesto M., Jr.*, 1996–NMCA–039, ¶ 15, 121 N.M. 562, 915 P.2d 318, or abuse of discretion, *see State v. Sosa*, 1997–NMSC–032, ¶ 9, 123 N.M. 564, 943 P.2d 1017.

{34} Defendant argues that two provisions in the current Delinquency Act suggest the Legislature's intent to apply the beyond a reasonable doubt standard to the Section 32A–2–20 findings. These two provisions, Section 32A–2–24(B) (requiring proof beyond a reasonable doubt in probation revocation hearings), and Section 32A–2–16(E) (requiring proof beyond a reasonable doubt in a delinquency proceeding), are readily distinguishable from the amenability determination under Section 32A–2–20(B). First, the requirement of proof beyond a reasonable doubt in a delinquency proceeding is constitutionally mandated. *See In re Winship*, 397 U.S. at 364, 90 S.Ct. 1068. Second, a probation revocation hearing, like an adjudication, requires proof that a defendant is guilty of an act that occurred in the past. The Legislature's distinction between the proof required for a finding of guilt versus the proof required to find an adjudicated youthful offender non-amenable to treatment as a child is consistent with federal and state precedent. *Compare id. with Kent*, 383 U.S. at 547–48, 86 S.Ct. 1045.

{35} We note that New Mexico courts have consistently held that the lack of a standard of proof for the amenability findings does not violate due process under the federal constitution. *See State v. Doyal*, 59 N.M. 454, 461–62, 286 P.2d 306, 311–12 (1955) (upholding law allowing any child charged with a felony to be prosecuted in district court); *State v. Jimenez*, 84 N.M. 335, 336, 503 P.2d 315, 316 (1972) (holding transfer

statute constitutional and noting that revised statute gave greater guidance to trial courts in determining whether juvenile should be tried in adult court than statute upheld in *Doyal*); *State v. Doe*, 91 N.M. 506, 509–10, 576 P.2d 1137, 1140–41 (Ct.App.1978) (holding that treatment as a child is not a constitutional right, but a right granted by the Legislature and statute met basic due process requirements); *State v. Doe*, 100 N.M. 649, 651, 674 P.2d 1109, 1111 (1983) (holding statute which required consideration, rather than a finding, of amenability was constitutional); *In re Ernesto M., Jr.*, 121 N.M. 562, 915 P.2d 318, 1996–NMCA–039, ¶¶ 5–8 (holding that current statute meets due process requirements and that federal constitution does not require a particular standard of proof); *Sosa*, 123 N.M. 564, 943 P.2d 1017, 1997 NMSC 032, ¶ 9 (holding that decision to sentence juvenile as an adult subject to abuse of discretion review).

{36} Finally, when compared with the laws of other states, the lack of a discernible standard in Section 32A–2–20 appears in keeping with the majority rule. As of 1999, 47 states have statutes granting juvenile court judges the power to waive jurisdiction over cases involving juvenile offenders so that they may be transferred to an adult criminal court. *See* Patrick Griffen, *Frequently Asked Questions* (2000) <http://161.58.45.127/stateprofiles/transfer2.html>. The most prevalent transfer statute gives the juvenile courts complete discretion in deciding which cases are appropriate for transfer. In the 46 states with discretionary transfer statutes, the majority require proof by substantial or a preponderance of the evidence. *See id.* In two states, the prosecution is required to prove non-amenability to treatment as a juvenile by clear and convincing evidence. *See* Miss. Code Ann. § 43–21–157 (1999); W. Va.Code § 49–5–10 (1997). In four states that combine discretionary and presumptive waiver provisions, the burden of proof by clear and convincing evidence rests upon the party seeking to rebut the presumption (for discretionary waivers, the prosecution; for presumptive waivers, the defendant). *See* Ark. Code Ann. § 9–27–318(h) (1999); Minn.Stat.

§ 260B.125 (1999); Okla. Stat. Ann. tit. 10, § 7303–4.3 (1997); Wis. Stat. Ann. § 938.18 (1999). No states require proof beyond a reasonable doubt.

{37} Based on the legislative history of the code, New Mexico case law, and statutes from other jurisdictions, we find no reason to hold that the New Mexico Constitution requires a "beyond a reasonable doubt" standard. We need not decide in this case whether to adopt the preponderance standard advocated by the State in view of the trial court's use of the "clear and convincing" standard and our upholding of its decision based on it in the next section of this opinion.

## C. Sufficiency of the Evidence

{38} Defendant argues that whatever standard of proof is applicable, the State failed to prove that Defendant was not amenable to treatment as a juvenile or eligible for commitment to an institution for the developmentally disabled or mentally disordered. *See* § 32A–2–20(B). We disagree.

### 1. Standard of Review

{39} Defendant argues that this Court should review the entire record in a de novo type of manner to determine whether the evidence supported a finding that Defendant was not amenable to treatment as a juvenile or eligible for commitment. Defendant argues that *State v. Sheets*, 96 N.M. 75, 78, 628 P.2d 320, 323 (Ct.App.1981), and *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), require us to consider all the evidence presented to the trial court. We do not read either case as supportive of Defendant's claim. *Sheets* and *Jackson* stand for the unremarkable proposition, long accepted by New Mexico courts, that in reviewing the sufficiency of the evidence supporting a conviction, whatever evidence is reviewed by this Court must be viewed in the light most favorable to the prosecution. *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781 ("Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." (emphasis in original)).

{40} In assessing a claim of evidentiary insufficiency, this Court asks whether substantial evidence supports the court's decision. *In re Ernesto M., Jr.*, 121 N.M. 562, 915 P.2d 318, 1996–NMCA–039, ¶ 15. Neither the basic formulation of the question nor the language we use in describing the trial courts' function changes depending on the standard of review. "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support a conclusion." *State v. Laguna*, 1999–NMCA–152, ¶ 7, 128 N.M. 345, 992 P.2d 896. This Court views the evidence in the light most favorable to the trial court's decision, resolves all conflicts and indulges all permissible inferences to uphold the court's decision, and disregards all evidence and inferences to the contrary. *Id.* We do not reweigh the evidence and will not substitute our judgment for that of the trial court. *In re Ernesto M., Jr.*, 121 N.M. 562, 915 P.2d 318, 1996–NMCA–039, ¶ 15. We recognize that the factfinder is entitled to disregard evidence presented by either party, *State v. Sutphin*, 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988), and to disregard the testimony of experts, *see In re Ernesto M., Jr.*, 121 N.M. 562, 915 P.2d 318, 1996–NMCA–039, ¶ 14. Our role is to review the evidence to determine whether any rational fact-finder could conclude that the proof requirement below was met. *See Jackson*, 443 U.S. at 319, 99 S.Ct. 2781 ("the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"); *In re Termination of Parental Rights of Eventyr J.*, 120 N.M. 463, 466, 902 P.2d 1066, 1069 (Ct.App.1995) ("Our standard of review is therefore whether, viewing the evidence in the light most favorable to the prevailing party, the fact finder could properly determine that the clear and convincing standard was met."). In this case, because the trial court used the clear and convincing standard, we will evaluate whether, viewing the evidence in the light most favorable to the State, the trial court could have found

that the clear and convincing standard was met.

## 2. Amenability to Treatment

{41} Defendant challenges the trial court's finding of non-amenability on three grounds: (1) the court ignored the uncontradicted expert testimony that Defendant was amenable to treatment, (2) the court misunderstood or mischaracterized the expert testimony in its finding, and (3) the court misapplied the Section 32A–2–20(C) factors.

{42} The evidence regarding Defendant's amenability to treatment or rehabilitation was not uncontradicted as Defendant suggests. Although the experts testified that Defendant had made some progress in therapy, the testimony indicated that he carried the risk of violence with him and that it was impossible to predict whether he would reoffend given that, at the time of the hearing, he was sheltered from his peers. At least one of the defense witnesses who had observed Defendant's progress while in treatment testified that Defendant's progress had been sporadic: some days Defendant seemed to work at getting better, other days he appeared to be just "playing the game." Furthermore, several expert witnesses expressed concern over Defendant's lack of remorse for the murder. Finally, most experts expressed an understanding that amenability to treatment or rehabilitation under Section 32A–2–20(B) is a bigger question than responsiveness to psychiatric care.

{43} As stated above, "[i]t is well settled in New Mexico that a factfinder may disregard the opinions of experts." *In re Ernesto M., Jr.,* 121 N.M. 562, 915 P.2d 318, 1996–NMCA–039, ¶ 14. The trial court chose to disregard the testimony of most experts because their opinions of Defendant's prospects for rehabilitation were formed without knowledge of Defendant's history of destructive and aggressive behavior. In the case of Sonde Harley Grano, the expert witness whom the court did find credible and upon whose testimony the court relied in making its findings, the court was entitled to disregard her ultimate conclusions as to Defendant's amenability. As the court said, "[Ms.] Grano felt that he was amenable to treat-

ment, but everything else she said indicated that she really had serious doubts."

{44} Furthermore, although the trial court did appear to misunderstand or misremember some of Ms. Grano's testimony, other evidence supported the court's conclusions. For example, although the court seemed to misunderstand Ms. Grano's testimony regarding Defendant's appearance of passivity at the time of the hearing, Ms. Grano later testified that it was impossible to predict whether Defendant's passivity was a permanent change given that Defendant was sheltered from his peers at the time of the hearing.

{45} Finally, Defendant argues that the court erred by using the seven factors set forth in Section 32A–2–20(C) to control, rather than guide, its finding that Defendant was not "amenable to treatment or rehabilitation as a child in available facilities." Section 32A–2–20(B)(1). We note that the court was required to consider and balance these factors in making its finding. *See* § 32A–2–20(C). Furthermore, contrary to Defendant's assertion that factor (C)(7) is the only factor relevant to determining a child's amenability to treatment, we believe that every factor provides important information about the child and the child's prospects for rehabilitation. *See* § 32A–2–20(C).

{46} Defendant pleaded guilty to second degree murder, aggravated battery, two counts of aggravated assault, and aggravated burglary. Any one of these offenses alone was sufficient to subject Defendant to the possibility of adult sentencing. *See* § 32A–2–3(I) (list of crimes subjecting child to youthful offender status). These offenses were clearly committed in a violent and aggressive manner. After killing Victim, Defendant and his accomplice fired 18–22 shots at Wife and the neighbors. In addition, Defendant purposefully damaged Victim's home. Furthermore, there was considerable evidence that Defendant had grown increasingly out-of-control and violent in the year preceding the murder. Several experts testified to an inability to predict whether Defendant would pose a threat of danger in the future, and Ms. Grano testified that rehabilitation was possible only with long term therapy at a

high security facility. In his report to the court, Defendant's probation officer gave his opinion that Defendant was unwilling to accept responsibility for his behavior and that this unwillingness demonstrated Defendant's non-amenability to treatment or rehabilitation. Based on the above, we hold that there was substantial evidence to support the trial court's finding of non-amenability by clear and convincing evidence.

### 3. Eligibility for Commitment

{47} Defendant appears to argue that if any expert deems a child eligible for commitment under NMSA 1978, § 32A–6–13(I) (1995), or if any treatment facility is willing and able to accept the child, then the court must find the child eligible for commitment to an institution. However, this is not the standard under Section 32A–2–20(B)(2). In deciding whether Defendant was eligible for commitment, the trial court was required by statute to consider the seven factors listed in Section 32A–2–20(C). The court's role in determining a child's eligibility is not as simple as tallying votes for and against commitment. The trial court must observe the child, measure the credibility of witnesses, consider the security and appropriateness of available facilities, and analyze all the evidence in light of the Section 32A–2–20(C) factors. It was not enough that Defendant made some progress in therapy; the question was whether he could be successfully rehabilitated or treated for his mental illnesses given available facilities and the time remaining before Defendant reached the age of twenty-one.

{48} Furthermore, one expert witness testified that Defendant's mental status would need to decline significantly before Defendant could be committed under Section 32A–6–13(I). If, at age 21, Defendant was dangerous to himself or others, but was not mentally ill, the State would be severely limited in its efforts to protect the public. In addition, another defense witness testified that, while Defendant may be eligible for some degree of residential treatment, he was not eligible for high security residential treatment. Finally, several experts testified that Defendant was ineligible for commit-

ment to an institution for the developmentally disabled. Based on these opinions and a review of the evidence considered under the seven factors of Section 32A–2–20(C), we hold that substantial evidence supported the trial court's finding that Defendant was not eligible for commitment by clear and convincing evidence.

### III. CONCLUSION

{49} We affirm.

{50} **IT IS SO ORDERED.**

I CONCUR: RICHARD C. BOSSON, Chief Judge.

BUSTAMANTE, Judge (specially concurs).

BUSTAMANTE, Judge (specially concurring).

{51} I agree with the majority that affirmance is appropriate. However, I would take the opportunity to finally determine the standard of proof required to establish that a youthful offender is not amenable to treatment or rehabilitation. I concur in the result the majority has reached as to the *Apprendi* issue, though I cannot agree with most of the analysis which produces it.

### STANDARD OF PROOF

{52} The majority declines to decide which standard of proof is appropriate for the amenability finding. I agree that the two provisions Defendant relies upon in the juvenile code do not support his argument, and I recognize that the majority accurately cites New Mexico case law on this issue, but I believe it is time to settle the issue.

{53} In our last pronouncement on the issue—*In re Ernesto M., Jr.*—we rejected a constitutional challenge to Section 32A–2–20 by noting that the current provision gave more guidance than its predecessor, which had also passed constitutional muster. We held that the statute provided "elemental due process" (notice, hearing, assistance of counsel, and a statement of the judge's decision rationale) and did not address what standard of proof was required. *In re Ernesto M., Jr.*, 1996–NMCA–039, ¶¶ 6–8, 121 N.M. at 566, 915 P.2d at 322.

{54} That discussion would have been particularly apropos in *In re Ernesto M., Jr.* in that the defendant there also challenged the manner in which the trial court weighed the statutory factors. In *In re Ernesto M., Jr.*, the trial judge indicated he felt the order of appearance of the seven factors in Section 32A–2–20 suggested they were to be read and weighed in "descending order of importance." *In re Ernesto M., Jr.*, 121 N.M. 562, 915 P.2d 318, 1996–NMCA–039, ¶ 9. Under this interpretation the most important and weighty factor would be the seriousness of the crime, and so forth. Weighing the factors in this manner has obvious implications for the nature of the inquiry; that is, whether the inquiry broadly speaking will emphasize rehabilitation or punishment. We did not address the issue substantively, finding instead no prejudice to the defendant in the context of that case regardless of how the trial court weighed the factors. I, of course, do not question the result in *In re Ernesto M., Jr.*, but the case does illustrate that there is a basic uncertainty as to the manner in which trial judges in New Mexico should consider and apply Section 32A–2–20. That uncertainty is exacerbated by failing to provide guidance as to one of the most basic issues in any factual assessment-the standard of proof guiding the fact finder's deliberations. As the Supreme Court in *In re Gault* noted: "Juvenile Court history has again demonstrated that unbridled discretion, however benevolently motivated, is frequently a poor substitute for principle and procedure." 387 U.S. 1, 18, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).

{55} A standard of proof has at least two functions: It serves to guide the fact finder as to the level of confidence it should have in its decision and it serves as a means of allocating the risk of error between the litigants. *In re Winship*, 397 U.S. at 370–71, 90 S.Ct. 1068; *Santosky v. Kramer*, 455 U.S. 745, 755, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

{56} By way of illustration, the Supreme Court in *Santosky* contrasted the bases for the preponderance of the evidence and beyond reasonable doubts standard as follows:

Thus, while private parties may be interested intensely in a civil dispute over money damages, application of a "fair preponderance of the evidence" standard indicates both society's "minimal concern with the outcome," and a conclusion that the litigants should "share the risk of error in roughly equal fashion." [*Addington*, 441 U.S. at 423, 99 S.Ct. 1804.] When the State brings a criminal action to deny a defendant liberty or life, however, "the interests of the defendant are of such magnitude that historically and without any explicit constitutional requirement they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment." *Id.* The stringency of the "beyond a reasonable doubt" standard bespeaks the "weight and gravity" of the private interest affected, *id.*, at 427, 99 S.Ct. 1804, society's interest in avoiding erroneous convictions, and a judgment that those interests together require that "society impos[e] almost the entire risk of error upon itself." *Id.*, at 424, 99 S.Ct. 1804.

*Santosky*, 455 U.S. at 755, 102 S.Ct. 1388.

{57} I appreciate the concern the majority expresses concerning the propriety of imposing the criminal beyond a reasonable doubt standard to this particular finding. Amenability is more predictive than historical. It is an attempt to predict the future conduct of the juvenile defendant. Moreover, the statute makes it clear that it is not simply a medical or psychological question. It is a mixed bag of history, potential for treatment, and a straightforward need to protect the public. In addition, by the time the trial court is making the amenability assessment, the juvenile has already been convicted or has pled to criminal conduct making the sentencing necessary. The conviction must occur under the normal beyond a reasonable doubt standard. Thus, by the time of sentencing, the criminal policy objectives noted above have, for the most part, been fulfilled.

{58} Employing the three-part test enunciated by the United States Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), I suggest that the

amenability hearing should be determined on a clear and convincing evidence standard. I thus agree with the trial judge here who ruled that clear and convincing was the appropriate standard. The *Mathews* factors are: (1) the private interest affected by the proceeding, (2) the risk of error created by the State's chosen procedure, and (3) the countervailing governmental interest supporting use of the challenged procedure. *Id.* at 335, 96 S.Ct. 893. The aim of *Mathews* test is to assess what process is due in any given situation. Courts have employed the *Mathews* test in a variety of situations, including civil commitment proceedings, *Addington,* 441 U.S. at 418, 99 S.Ct. 1804; termination of parental rights, *Santosky,* 455 U.S. 745, 102 S.Ct. 1388; worker compensation hearings, *United States v. Woods,* 931 F.Supp. 433 (E.D.Va.1996); and tenured faculty termination hearings, *Patterson v. Bd. of Regents,* 119 Wis.2d 570, 350 N.W.2d 612 (1984).[1]

{59} Applying *Mathews* points to the need for at least an intermediate standard of clear and convincing evidence. The weight or value of the private interest at stake is clear and significant. Personal liberty and freedom of movement have consistently been treated as surpassing values in the United States, and state initiated proceedings curtailing freedom have consistently called for heightened standards of proof. The criminal standard is the benchmark, but there are other types of actions involving curtailment of personal freedom which invoke an intermediate standard, i.e., civil commitments (*Addington,* 441 U.S. at 478, 99 S.Ct. 1831), deportation (*Woodby v. INS,* 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966)), denaturalization (*Schneiderman v. United States,* 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943)).

{60} Of course, by the time a juvenile defendant faces an amenability hearing, he or she has already forfeited the right to be free as such. The choice at this point is between the juvenile and adult systems. With the former, the juvenile likely faces a shorter time of incarceration and the potential for treatment and rehabilitation. With the latter sentence, the juvenile faces significantly longer incarceration in a harsher environment and the prospects of little or no treatment and rehabilitation. Thus, while the individual interest at the time of the amenability hearing is muted, it is still significant.

{61} The risk of error is unquestionably heightened by the absence of a specific standard of proof which the trial courts know to apply. This is not to disparage the work, quality, or good faith of trial judges. It is simply a reflection of the difficulty of the task and a common sense observation that the lack of a specific standard makes the task that much harder. Faith in the quality of the children's court bench is simply not an entirely satisfactory substitute for appropriate due process standards.

{62} The interests of the State are complex. Any adverse monetary impact created by meeting a higher standard of proof can be expected to be de minimis and should be discounted. The State's interest in the outcome of the amenability hearing are conflicting. On the one hand the State is dealing with a convicted juvenile. The societal policy preferring freeing the guilty to convicting the innocent which drives the criminal standard is no longer applicable in full force. The stronger societal interest is now self-protection and, frankly, punishment. On the other hand, the State has a continuing interest in attempting to salvage its youth from the sad consequences of their actions. Abandoning the goal of rehabilitation should not be made too easy through the mechanism of a too-low standard of proof. On balance, the *Mathews*

---

1. The United States Supreme Court also used *Mathews* in two criminal cases. *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) and *United States v. Raddatz,* 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). The Court recently retreated from use of *Mathews* in evaluating state procedural due process rules in the criminal area, recognizing a potential for undue federalization of the area beyond truly fundamental concerns. *Medina v. California,* 505 U.S. 437, 442–43, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992). The Court's concerns do not cast doubt on a state court's adaptation and use of the *Mathews* factors to determine "what procedures are due" in its own courts. *See Britton v. Rogers,* 631 F.2d 572, 580 (8th Cir.1980). I thus disagree with the Arizona Supreme Court's decision in *State v. Wagner,* 194 Ariz. 310, 982 P.2d 270, 273 (1999) (en banc).

factors call for a heightened standard of proof short of "beyond a reasonable doubt"; clear and convincing is the normal rubric for this level.

{64} *Breed,* 421 U.S. 519, 95 S.Ct. 1779 is not to the contrary. In *Breed,* the United States Supreme Court held that double jeopardy applied to juvenile transfer proceedings if a determination that the juvenile had violated the law was made prior to or at the transfer hearing. Since jeopardy attached at that point, the Court held that the juvenile could not then be retried in adult court. In exploring the procedural consequences of its ruling, the Court observed that complying with its decision should not in and of itself change the nature of transfer hearings. The court noted that it had ". . . never attempted to prescribe criteria for, or the nature and quantum of evidence that must support, a decision to transfer a juvenile for trial in adult court." 421 U.S. at 537, 95 S.Ct. 1779. That statement in *Breed* is a little more than a descriptive statement of the then state of the law. The Court up to that time had not addressed the standard of proof required in what were then termed transfer hearings, and it still has not to this date. The Court's observation should not be read as a holding or acknowledgment by the court that no standard of proof is required. Rather, it is more appropriate to read it as assurance by the Court that no change of procedure—such as a showing of probable cause that the juvenile committed an offense—was required to comply with its double jeopardy ruling.

{65} In sum, adopting a clear and convincing standard of proof would provide a welcome guide to the trial bench as they make these difficult decisions. It would also make the process more consistent and predictable for the state and defendants alike.

### APPRENDI ISSUES

{66} I am simply not as confident as the majority that the rule of *Apprendi* is inapplicable to our juvenile sentencing system.

{67} The differences between the juvenile and adult justice systems are not in my view so dramatic or fundamental that *Apprendi* of

necessity cannot be applied. To be sure the juvenile justice system places comparatively more emphasis on rehabilitation than the adult system does. But, the juvenile system has increasingly concerned itself with accountability and protection of the public, narrowing the gap between the two approaches. The gap almost disappears in cases such as this where the offenses are serious and the amenability determination can result in tripling the sentence imposed on the defendant. And, despite the theoretical possibility of imposing a juvenile sentence after a finding of non-amenability, I cannot imagine a situation where a trial judge would find any reason to do so. Whatever the ideal purposes of the amenability hearings may be, the end result is punishment, potentially if not probably, at adult levels.

{68} Despite my reservations about the route taken by the majority, I must agree with the result. As the majority notes, juveniles have no constitutional right to be treated as a child within the juvenile system.[2] Given that limitation, the legislature can set sentencing essentially as it pleases for juveniles. New Mexico's unique system has given the trial judge two sentencing options. The amenability determination helps guide which option a judge may employ, but it does not increase the maximum sentence allowed by the legislature. In this way, our system most closely resembles in operation the capital sentencing procedures approved by the Supreme Court in *Apprendi,* 120 S.Ct. at 2389.

---

**2.** There may be limits to this proposition, but they likely would not arise in situations such as we have here—a conviction of second degree murder committed by a then fourteen year old.