2002-NMCA-037

43 P.3d 359

**STATE of New Mexico,**
**Plaintiff–Appellee,**

v.

**Joel IRA, Defendant–Appellant.**

**No. 21,375.**

Court of Appeals of New Mexico.

Jan. 24, 2002.

Certiorari Denied, No. 27,355,
April 4, 2002.

Patricia A. Madrid, Attorney General, James O. Bell, Assistant Attorney General, Santa Fe, NM, for Appellee.

Gary C. Mitchell, Gary C. Mitchell, P.C., Ruidoso, NM, for Appellant.

## OPINION

PICKARD, Judge.

{1} In this case, we are called upon to determine whether a 91½-year adult sentence imposed against the juvenile Defendant for brutally and repeatedly sexually abusing his younger stepsister over a two-year period is cruel and unusual punishment. Defendant also argues that the district court abused its discretion in refusing to allow him to withdraw his guilty plea. We hold that the sentence is constitutional and that the trial court did not err in refusing to allow the plea withdrawal. We therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

{2} This appeal arises from a series of sexual assaults and other violent attacks committed by Defendant, when he was four-

teen and fifteen years old, mostly upon his stepsister, who is nearly six years younger than he is. The State charged Defendant with ten counts of first-degree criminal sexual penetration, one count of aggravated battery against a household member, one count of aggravated battery, one count of battery against a household member, and one count of intimidation of a witness. The State also filed notice of its intent to invoke adult sanctions.

{3} Under New Mexico's Children's Code, once the notice of intent to invoke adult sanctions is filed and the child is adjudged a youthful offender, the district court is given the discretion to impose either an adult sentence or juvenile disposition on the child. *See* NMSA 1978, § 32A–2–20(A) (1995). Prior to July 1, 1996, the definition of a youthful offender included a child, fifteen to eighteen years of age at the time of the offense, who is adjudicated for committing at least one of a number of enumerated offenses, including aggravated battery and criminal sexual penetration. NMSA 1978, § 32A–2–3(I)(1) (1995). Effective July 1, 1996, the age range for youthful offender status was changed to cover juveniles fourteen to eighteen years of age at the time of the offense. NMSA 1978, § 32A–2–3(I)(1) (1996). If the court chooses to impose a juvenile disposition on an adjudicated youthful offender, the court may enter a judgment for the supervision, care, and rehabilitation of the child that may include an extended commitment until the child reaches the age of twenty-one. *See* NMSA 1978, § 32A–2–20(E) (1996); *see also* NMSA 1978, §§ 32A–2–19 (1996) & –23 (1995). To impose an adult sentence on an adjudicated youthful offender, the court must find that "(1) the child is not amenable to treatment or rehabilitation as a child in available facilities; and (2) the child is not eligible for commitment to an institution for the developmentally disabled or mentally disordered." Section 32A–2–20(B). In making such findings the court is required to consider several factors, focusing on the seriousness of the offense and the likelihood of a reasonable rehabilitation of the child that would provide adequate protection of the public. Section 32A–2–20(C)(1)–(8).

{4} Following a plea hearing at which Defendant was advised that he could be sentenced as an adult on all charges for a maximum sentencing exposure of 185 years, Defendant entered into a plea and disposition agreement in which he agreed to plead no contest to all charges except for one count of battery against a household member (his father), which the State agreed to dismiss. Under the plea agreement, the district court retained sentencing discretion, with the understanding that Defendant would argue for a juvenile disposition and the State would argue for adult sanctions.

{5} The district court held an extensive sentencing hearing to determine whether to sentence Defendant as a child or an adult. The court began by hearing about the nature and seriousness of Defendant's offenses through the testimony of Defendant's stepsister (the Victim). The Victim testified that Defendant came to live with her family during 1995, when she was eight years old and Defendant was fourteen years old. The Victim testified that Defendant was nice to her at first, but he soon began to sexually abuse her.

{6} The Victim recounted numerous instances of vaginal, oral, and anal sex that took place about every other day over the course of about two years. She also recalled times when Defendant forced her to swallow his urine and semen. The Victim described how Defendant's acts would sometimes cause her so much pain that she would stick her head into a pillow to scream, she would almost vomit at times, and she would bleed from her rectum. Defendant also had a method of signaling the Victim that another rape was about to occur; he would tap his fingers on the arm of his chair. In addition to the sexual abuse, Defendant physically abused the Victim on several occasions and frequently threatened to kill her if she ever told anyone about his actions. He once choked her to unconsciousness. The Victim also talked about Defendant's violent mistreatment of her dog and other creatures, and described how he liked to play with fire.

{7} The Victim also testified about the mental and emotional toll that she suffered from the abuse. In particular, she indicated

that her grades began to drop, she was diagnosed with Attention Deficit Disorder, and, after Defendant was finally arrested, she began to have nightmares about Defendant looking for her all over the world to kill her. In one nightmare, she stabs Defendant in the back when he finds her, and in another nightmare, Defendant finds her and stabs her to death.

{8} In an effort to assess Defendant's amenability to treatment and the threat that he posed to society, the court also received testimony from a number of mental health and juvenile justice professionals. Defendant's juvenile probation officer recounted Defendant's extensive history of prior delinquency referrals for other offenses, and he described the extent to which Defendant did or did not comply with prior rehabilitation efforts. The juvenile probation officer further noted that Defendant lacked remorse, feeling that he did not do anything wrong in this case. In light of the seriousness of Defendant's current offenses, the juvenile probation officer did not believe that Defendant was amenable to treatment in the juvenile justice system and strongly urged the court to impose an adult sentence, remarking that Defendant's case was the first time he had ever recommended adult sanctions for a juvenile offender.

{9} The court also heard testimony from the Director of Psychological Services at the New Mexico Boys' School. He opined that Defendant had a very low chance of rehabilitation and did not believe he would benefit from the treatment services offered at the Boys' School. Although the Boys' School does have a sex offender treatment program, Defendant is not the type of client the program treats because of his tendency toward combining sex with other violent, antisocial conduct. Because Defendant was abused to some degree as a young child, had a history of hurting animals, had a fascination with fire, and exhibited violent sexual behavior, the director suggested that Defendant fit the profile of a serial offender and was of the opinion that New Mexico has no facilities to treat Defendant.

{10} The testimony received by the court from three other mental health experts who

evaluated Defendant was remarkably consistent. One psychotherapist described Defendant as a pedophile who could not be successfully rehabilitated and would need a long-term institution. The other psychotherapist and clinical psychologist both diagnosed Defendant as having a severe conduct disorder, with tendencies towards violent sexual behavior and domination, that would require intensive, secured, long-term treatment. Perhaps most disturbing was their conclusion that Defendant is in effect a child without a conscience who lacks empathy or the ability to be concerned for others. All three experts noted that Defendant failed to show any remorse and refused to take responsibility for his actions. They also uniformly agreed that Defendant could not be treated successfully at the New Mexico Boys' School, and, that if sent there, he would surely re-offend upon release. To the extent that the experts believed Defendant might benefit from a long-term, intensive treatment program, the limited number of potentially available treatment programs were discussed and were generally deemed inadequate. However, even assuming that an adequate treatment program could be found, none of the experts could predict how long such treatment would take, nor could they give the court any degree of assurance that rehabilitation efforts would be successful.

{11} After considering the evidence presented at the sentencing hearing, the court issued a thoughtful and detailed explanation of its sentencing decision. Portions of that decision, which so clearly set forth the circumstances of this case and the dilemma faced by the court, are set forth below:

In a day of extraordinary testimony by some of the most experienced and qualified experts in the field of juvenile corrections and psychotherapy, this Court was told that [Defendant] is a child devoid of conscience and devoid of empathy for other human beings, most notably the victims of the heinous acts charged in this case. The experts say that each human being must develop these tools at a young age, for personalities become fixed before the teenage years and it is very hard, if not impossible, to implant a conscience in a sixteen

year old where none existed before. These experts looked, in this case, for evidence of remorse or empathy that would provide the slightest glimmer of hope that [Defendant] could defy the odds and become rehabilitated, and they found none. According to one, [Defendant] feels that he is not the problem here. The experts told this Court that New Mexico simply does not have a program that offers even a slight hope of protecting the public if [Defendant] were released from custody. When asked if that circumstance is a failing on the part of the State to provide services its citizens should expect, the experts doubted whether there is a program with any hope of success for [Defendant] anywhere in the country.

\* \* \*

The Legislature has told the Courts that, while most of the time juveniles should be looked upon with forgiveness and with their best interests foremost in mind, there will be those times and those perpetrators who do not fit the mold: those for whom the offenses are not youthful pranks, or even misguided excess that can be treated and put in the past. The Legislature has said that, sometimes, the Court will encounter a juvenile whose crimes, and whose history and circumstances, and whose prospects for rehabilitation are so threatening to society, that the juvenile philosophy of patient correction and nurturing simply does not apply.

\* \* \*

Most compelling in this case is the expectation of the victims, particularly the eight-to-ten year old girl who was brutally and repeatedly raped and humiliated over a period of two years, that our system of justice will react in a way that recognizes the enormity of the terror and pain caused to her. Without years of effective counseling and therapy, it seems unimaginable that this little girl will grow up to be an emotionally healthy adult, with the opportunity for happiness in her adult relationships. What is the penalty that society should require for the near destruction of a life's potential?

\* \* \*

This Court would like to fashion a sentence that will guarantee, or even offer hope, that [Defendant] can be released after a period of time as a rehabilitated person, able to be a valuable part of, rather than a threat to, his community. There is no such sentence.

The Court would like to fashion a sentence that will assure [Defendant's] victims that he will not be a serious threat to them if released before he reaches an advanced age. There is no such sentence.

This Court must then fall back upon a sentence that will protect society from a man without a conscience until such time as his physical ability to cause harm is less than the likelihood that he would attempt it. To assure that result, in consideration of the crowded conditions of our prisons and the ability of the Department of Corrections to grant credit of up to half of an adult sentence in order to relieve overcrowding, the Court must impose twice what it intends to be the effective term of incarceration.

Consequently, after weighing against Defendant virtually every statutory factor that the court must consider when arriving at a disposition for a youthful offender, the district court found that Defendant was not amenable to treatment or qualified for commitment to an institution for the developmentally disabled or mentally incompetent. Accordingly, the court imposed consecutive adult sentences for six counts of first-degree criminal sexual penetration and concurrent adult sentences for the remainder of the counts, for a total sentence of 108 years.

{12} Shortly after entry of judgment and sentence, Defendant moved to invalidate the sentencing proceedings. Under the version of the Children's Code in effect when Defendant was fourteen years old, juveniles could only be sentenced as youthful offenders and subject to adult sanctions for offenses committed while age fifteen to eighteen. *See* § 32A–2–3(I)(1) (1995). Consequently, Defendant argued that the district court erred

by imposing adult sentences for counts that were based on acts committed by Defendant while he was fourteen years old. For similar reasons, the State moved to modify the sentence so that Defendant was subject to adult sanctions only for those counts that were based on acts committed by Defendant while he was fifteen years old. Although five of the counts for first-degree criminal sexual penetration and two aggravated battery counts involved acts committed while Defendant was fourteen years old, the district court relied on *State v. Montano*, 120 N.M. 218, 900 P.2d 967 (Ct.App.1995), to conclude that adult sanctions could be imposed for all counts since Defendant was fifteen years old when he committed some of the counts. Accordingly, the district court denied Defendant's motion to invalidate the sentencing proceedings and the State's motion to modify sentence.

{13} Defendant subsequently appealed to this Court arguing, among other things, that the trial court erred in sentencing Defendant as an adult for crimes committed before he was fifteen years old. In an unpublished, memorandum opinion, this Court rejected the district court's construction of *Montano* and concluded that the district court erred by imposing adult sanctions for acts committed by Defendant while he was fourteen years old. *See State v. Joel I.*, Ct.App. No. 18,915 (Filed October 1, 1998). We therefore reversed Defendant's sentence and remanded for resentencing.

{14} On remand, the district court resentenced Defendant to six consecutive adult sentences for five counts of CSP I and one count of intimidation of a witness, each committed by Defendant while he was fifteen years old, for a total sentence of 91½ years. The district court imposed a juvenile disposition for the remainder of the counts, ordered the juvenile sentence to be served concurrently to the adult sentence, and committed Defendant to the custody of the New Mexico Department of Corrections for incarceration as an adult. Defendant moved for reconsideration of the sentence and submitted additional evidence to support his renewed request for a juvenile disposition on all charges. Nonetheless, the testimony contin-

ued to reflect the reality that it was unlikely Defendant could ever be successfully rehabilitated.

{15} In addition to arguing for juvenile sanctions, Defendant moved to set aside his plea agreement, arguing that the plea was based on an invalid plea agreement because it contemplated an illegal sentence. The district court rejected all of Defendant's arguments, leaving the 91½-year sentence in place. Defendant now appeals for a second time to this Court.

## DISCUSSION

{16} Defendant does not argue that the district court abused its discretion, or lacked substantial evidence, to impose adult sanctions against him as a youthful offender. Rather, Defendant argues that his sentence of 91½ years constitutes cruel and unusual punishment. Defendant further argues that the district court abused its discretion in denying Defendant's motion to set aside his plea. We address each argument in turn.

### Cruel and Unusual Punishment

{17} Whether a particular sentence amounts to cruel and unusual punishment raises a constitutional question of law that we review de novo on appeal. *See State v. Rueda*, 1999–NMCA–033, ¶ 5, 126 N.M. 738, 975 P.2d 351. However, because a cruel and unusual punishment challenge necessarily focuses on the factual circumstances of the particular case, we view the facts in the light most favorable to the district court's decision and defer to the district court on evidentiary matters of weight and credibility. *See State v. Arrington*, 120 N.M. 54, 55, 897 P.2d 241, 242 (Ct.App.1995); *State v. Arrington*, 115 N.M. 559, 561–62, 855 P.2d 133, 135–36 (Ct. App.1993). Although Defendant argues that his sentence constitutes cruel and unusual punishment under both our state and federal constitutions, he does not suggest that the protections afforded under our state constitution are any greater than those provided under the federal constitution. We, therefore, will proceed without regard for whether Defendant's challenge is brought under the state or federal constitution. *See Rueda*, 1999–NMCA–033, ¶ 8, 126 N.M. 738, 975 P.2d 351 (noting that federal and state provisions

prohibiting cruel and unusual punishment are nearly identical).

{18} To determine whether a sentence amounts to cruel and unusual punishment we must consider " '[w]hether in view of contemporary standards of elemental decency, the punishment is of such disproportionate character to the offense as to shock the general conscience and violate principles of fundamental fairness.' " *In re Ernesto M., Jr.*, 1996–NMCA–039, ¶ 22, 121 N.M. 562, 915 P.2d 318 (quoting *State v. Massey*, 60 Wash.App. 131, 803 P.2d 340, 348 (1990)). In this regard, we begin by comparing the gravity of the offense against the severity of the sentence to determine whether the punishment is grossly disproportionate to the offense. *Rueda*, 1999–NMCA–033, ¶ 12, 126 N.M. 738, 975 P.2d 351.

{19} As set forth above, the evidence presented at Defendant's sentencing hearing showed that Defendant repeatedly raped his younger stepsister over a two-year period, degrading and demeaning his young victim with a shocking number of humiliating and painful acts. In addition to the sexual abuse of his stepsister, Defendant repeatedly threatened her with death if she ever told on him. The evidence also showed that Defendant's actions exacted an emotional and psychological toll on his stepsister that is likely to affect her for the rest of her life. In spite of the horrendous and long-lasting nature of Defendant's acts, the evidence indicates that Defendant lacks remorse for his acts and is likely to commit similar acts in the future. In sum, when comparing the gravity of the offenses committed by Defendant to the sentence imposed by the court, we cannot say that Defendant's punishment is so grossly disproportionate as to shock the general conscience or violate principles of fundamental fairness. *See In re Ernesto M., Jr.*, 1996–NMCA–039, ¶¶ 2, 23, 121 N.M. 562, 915 P.2d 318 (holding that 30–year adult sentence against juvenile, who admitted to raping and torturing victim, does not constitute cruel and unusual punishment).

{20} Without focusing on the gravity of his offenses, Defendant emphasizes that he was only fifteen years old at the time of the acts for which he was sentenced. To be sure, the decision to sentence a child as an adult is an extreme sanction that cannot be undertaken lightly. That said, however, the imposition of a lengthy, adult sentence on a juvenile does not, in itself, amount to cruel and unusual punishment. *See In re Ernesto M., Jr.*, 1996–NMCA–039, ¶¶ 2, 22–23, 121 N.M. 562, 915 P.2d 318. While *In re Ernesto M., Jr.* involved a sentence that was considerably less than the sentence imposed in this case, sentences comparable to Defendant's have been imposed against juveniles around the country and have repeatedly withstood cruel and unusual punishment challenges. *See, e.g., State v. Green*, 348 N.C. 588, 502 S.E.2d 819, 827–34 (1998) (holding that mandatory life sentence for thirteen-year-old convicted of a first-degree sexual offense does not constitute cruel and unusual punishment); *Rodriguez v. Peters*, 63 F.3d 546, 566–68 (7th Cir.1995) (holding that it was not cruel and unusual punishment to sentence defendant, who was fifteen years old when he committed the murders, to life in prison without parole); *People v. Moya*, 899 P.2d 212, 219–20 (Colo.Ct.App.1994) (holding that there is no cruel and unusual punishment violation for sentencing juvenile defendant, convicted of robbery and murder, to life imprisonment with the possibility of parole after 40 years); *Brennan v. State*, 754 So.2d 1, 5, 11 (Fla.1999) (vacating death penalty imposed on sixteen-year-old defendant convicted of murder but reducing sentence to life imprisonment without a possibility of parole); *State v. Shanahan*, 133 Idaho 896, 994 P.2d 1059, 1061 n. 1, 1062–63 (Ct.App.1999) (holding that fifteen-year-old defendant's life sentence for murder did not constitute cruel and unusual punishment); *State v. Mitchell*, 577 N.W.2d 481, 488–91 (Minn.1998) (holding that mandatory life imprisonment for fifteen-year-old convicted of first-degree murder is not cruel and unusual punishment); *State v. Jensen*, 579 N.W.2d 613, 614, 623–25 (S.D.1998) (holding that life imprisonment without possibility of parole for fourteen-year-old convicted of murder is not cruel and unusual punishment); *Jackson v. Commonwealth*, 255 Va. 625, 499 S.E.2d 538, 554–55 (1998) (holding that imposition of death penalty upon six-

teen-year-old convicted of capital murder is not cruel and unusual punishment).

{21} Although an overwhelming number of states have rejected cruel and unusual punishment challenges to adult sentences imposed on juvenile offenders, Defendant relies on *Workman v. Commonwealth*, 429 S.W.2d 374, 377–78 (Ky.1968), as support for his contention that the sentence in this case is unconstitutional. In *Workman*, the Kentucky Court of Appeals held that a mandatory sentence of life without possibility of parole imposed on a fourteen-year-old defendant convicted of first-degree sexual offenses amounted to cruel and unusual punishment under the Kentucky State Constitution. *Id.* However, *Workman* is distinguishable for several reasons. First, *Workman* involved a life sentence without the possibility of parole. In contrast, Defendant was not given a life sentence in this case, and he does have the possibility of parole in this case, even though that possibility will not ripen for a very long time. Second, the defendant in *Workman* was fourteen years old at the time of the offense, while in this case adult sanctions were only imposed for offenses committed while Defendant was fifteen years old. Third, in *Workman*, the juvenile defendant committed a limited number of offenses during one attack on an elderly woman. Conversely, in this case Defendant committed multiple offenses against a very young child over the course of two years. Fourth, the opinion in *Workman* suggests that there was little, if any, evidence of record concerning the juvenile defendant's amenability to treatment. The opposite is true in this case in light of the substantial evidence in this case suggesting that Defendant is not amenable to treatment. And finally, the decision in *Workman* must be viewed within the context of circumstances as they existed over 30 years ago. In view of the qualitative differences in juvenile crime in today's society, we question the continued vitality of the *Workman* decision in light of contemporary standards and concerns. *See Green*, 502 S.E.2d at 831 (recognizing "the general consensus that serious youthful offenders must be dealt with more severely than has recently been the case in the juvenile system"). In short, we find no basis for relying on *Workman* to conclude that the sentence imposed against Defendant in this case constitutes cruel and unusual punishment.

■ {22} To the extent that we must consider the gravity of Defendant's offenses and the severity of his punishment within the context of contemporary standards of elemental decency, *see In re Ernesto M., Jr.*, 1996–NMCA–039, ¶ 22, 121 N.M. 562, 915 P.2d 318 Defendant implies that during the sentencing process the district court acted contrary to developing concepts of elemental decency. In particular, Defendant asserts that the district court ignored the possibility of juvenile treatment alternatives despite the existence of treatment programs and facilities throughout the country. However, Defendant's argument ignores the actual state of the record below. The expert testimony presented below was virtually unanimous in concluding that there were simply no programs or treatments available anywhere that could address the psychological and emotional problems that make Defendant a continuing danger to society. And while some of the experts may have held out a faint hope that rehabilitation might be possible if Defendant's treatment were intensive enough and prolonged enough, it is undisputed in the record below that no expert could give the court any reasonable degree of assurance that Defendant could be successfully rehabilitated by the time Defendant reached the age of twenty-one, which is the point at which the court would have lost jurisdiction over Defendant had he been sentenced as a juvenile.

■ {23} Defendant also makes vague allegations that the district court's failure to provide Defendant with treatment alternatives was the result of a legislative unwillingness to fund adequate treatment alternatives for individuals like Defendant. Our review of the record reveals no indication that the district court's decision to forego treatment alternatives was the result of financial constraints. To the contrary, the district court's decision reflected a desire to pursue rehabilitation, but a grim realization that an attempt at rehabilitation would not be possible in this case without creating an unreasonable risk to

the safety of Victim and the public at large because medicine and psychology have yet to develop reliable methods for rehabilitating individuals like Defendant.

■ {24} Defendant also submits an alternate basis for finding that his sentence amounts to cruel and unusual punishment, arguing that his sentence is unconstitutional because it goes beyond what is necessary to achieve the aim of public intent expressed by the legislature in the New Mexico Children's Code. *See Workman,* 429 S.W.2d at 378 (citing *Weems v. United States,* 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910), and *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962)). In this regard, Defendant seems to believe that the court's sentence was intended to exact retribution rather than encourage rehabilitation. Even if that were true, we question Defendant's assumption that a retributive sentence is somehow inconsistent with the sentencing of a juvenile as an adult. But in any event, the record simply does not support Defendant's assertion that the district court was interested in retribution to the exclusion of other considerations such as rehabilitation and protection of the public. Although Defendant's sentence is very long, the district court went to great lengths to explain that the sentence was intended as a means for protecting the public from Defendant in the face of a considerable amount of testimony demonstrating that Defendant was not amendable to current treatment methods and, as a result, would remain a threat to society. In short, we find no basis for agreeing with Defendant's contention that the district court's sentence was motivated by intentions inconsistent with contemporary standards of elemental decency or even with the legislative intent behind the Children's Code.

{25} Although we find no basis for concluding that the district court imposed an unconstitutional sentence, we cannot ignore the apparent gap in our current statutory structure for sentencing children as adults that was brought into relief by the circumstances of this case. The district court was ultimately presented with the task of fashioning a sentence that would recognize the gravity of the Defendant's offenses, and the threat that he poses to society, without ignoring the possibility for rehabilitation. But as the district court noted in its thoughtful decision, the limited jurisdiction it has over offenders sentenced as juveniles is simply inadequate when the juvenile offender is extremely dangerous and in need of intensive treatment that, if there is any hope of rehabilitation, must extend well beyond the time that our current statutory scheme gives our courts to rehabilitate juvenile offenders.

■ {26} After New Mexico's Children's Code was significantly revised in 1993, our state was recognized for its innovative response to the national movement to address what was perceived as an epidemic of violent juvenile criminals. *See* Lisa A. Cintron, *Rehabilitating the Juvenile Court System: Limiting Juvenile Transfers to Adult Criminal Court,* 90 Nw. U.L.Rev. 1254, 1277–82 (1996). Around the country, many states responded to violent juvenile crime with legislative initiatives that automatically transferred violent juvenile offenders to adult courts, or gave prosecutors unfettered discretion to transfer juvenile offenders into adult court, where they would be tried and sentenced as adults without regard to the individual circumstances of each child and his or her potential for rehabilitation. *See* Patricia Torbet, et al., *State Responses to Serious and Violent Juvenile Crime,* pp. 3–4, Washington DC: Office of Juvenile Justice and Delinquency Prevention (1996). Other states responded with what are known as blended sentencing schemes that give a sentencing court the discretion to impose a juvenile disposition or an adult sentence, or both, depending on the individual circumstances of each case. *Id.* at p. 12. New Mexico took the unique approach of providing for the trial of almost all juveniles in children's court, while still allowing the children's court to decide whether an adjudicated youthful offender should be sentenced as a juvenile or an adult. *Id.* at p. 12, *see also* Patricia Torbet, et al., *Juveniles Facing Criminal Sanctions: Three States that Changed the Rules,* Washington DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention (2000).

{27} Despite New Mexico's innovative approach to juvenile crime, the circumstances of this case reveal an inadequacy in our juvenile justice sentencing scheme. As noted above, when a youthful offender is sentenced as a child, the court's power over the child must end when the child reaches the age of twenty one. However, in some instances, successful rehabilitation would require a longer commitment to the rehabilitative resources of the juvenile justice system. And unfortunately, in some cases, despite providing the best treatment options available, rehabilitation will prove impossible. Because of these very real possibilities and the obligation that every sentencing court also has to protecting public safety, many courts, like the court in this case, will opt for a longer term of adult incarceration for a juvenile offender instead of risking a short-term, unsuccessful juvenile detention that would result in the premature release of a dangerous offender.

{28} The district court's dilemma in this case is not an isolated phenomenon. Indeed, a number of commentators have written extensively on the shortcomings inherent in a juvenile justice system that focuses on harsher punishment as the primary means of protecting the public from violent juvenile offenders. For example, serious doubts exist concerning the extent to which a "get tough" approach is truly effective in protecting the public from future violent crime. See Shannon F. McLatchey, Note, *Juvenile Crime and Punishment: An Analysis of the "Get Tough" Approach*, 10 U. Fla. J.L. & Pub. Pol'y 401, 414–16 (1999); Donna M. Bishop, Lonn Lanza–Kaduce, & Charles E. Frazier, *Juvenile Justice Under Attack: An Analysis of the Causes and Impact of Recent Reforms*, 10 U. Fla. J.L. & Pub. Pol'y 129, 142–46 (1998). To the extent that the movement toward the increased sentencing of juveniles as adults is an implicit recognition that violent juvenile offenders are just like adults, there is increasing evidence that many violent juvenile offenders currently sentenced as adults are in fact psychologically different from adults and, as such, are worthy of different treatment. See Eric K. Klein, *Dennis the Menace or Billy the Kid: An Analysis of the Role of Transfer to Criminal Court in*

*Juvenile Justice*, 35 Am.Crim. L.Rev. 371, 406–09 (1998); Elizabeth S. Scott & Thomas Grisso, *Symposium on the Future of the Juvenile Court: The Evolution of Adolescence: A Developmental Perspective on Juvenile Justice Reform*, 88 J.Crim. L. & Criminology 137, 154–89 (1997). Similarly, valid concerns exist regarding the extent to which the juvenile justice system may be relying too heavily on psychological experts to predict a child's amenability to treatment and future dangerousness. See Catherine R. Guttman, Note, *Listen to the Children: The Decision to Transfer Juveniles to Adult Court*, 30 Harv. C.R.-C.L. L.Rev. 507, 538–40 (1995).

{29} Given the complexities involved in effectively dealing with violent juvenile offenders, it is easy to understand why the district court wanted an alternative that did not exist within New Mexico's current juvenile sentencing structure. While it would be unrealistic to expect a legislative solution that would completely eliminate all of the doubt and apprehension that accompanies the decision to sentence a child as an adult, a number of states around the country have enacted blended sentencing alternatives that do give the sentencing judge the option of pursuing a juvenile, rehabilitative approach in marginal cases without sacrificing the ability to impose a long-term, adult incarceration if rehabilitation attempts prove futile. These are described in Shari Del Carlo, Comment, *Oregon Voters Get Tough on Juvenile Crime: One Strike and You Are Out!*, 75 Or. L.Rev. 1223, 1246–48 (1996) [hereinafter Del Carlo]. See also *State Responses to Serious and Violent Juvenile Crime*, at pp. 12–14.

{30} For example, in Texas the juvenile court is given the authority to impose lengthy, determinate sentences on juveniles for certain enumerated offenses. While the defendant is a juvenile, he remains confined in a youth facility focused on rehabilitative efforts. When the juvenile offender reaches the age of eighteen, the juvenile court is empowered to evaluate the juvenile's rehabilitative progress. At that point, the juvenile court can either continue to confine the offender in a juvenile facility for further rehabilitation efforts until the offender reaches

the age of twenty one, or commit the offender to an adult prison to serve the remainder of his sentence if rehabilitation efforts are proving unsuccessful. *See* Del Carlo, *supra,* at 1246–48. Other states like Massachusetts, Rhode Island, and Colorado have similar sentencing procedures. *See State Responses to Serious and Violent Juvenile Crime,* at pp. 12–14.

{31} Another example of an innovative, flexible sentencing scheme exists in Minnesota. In that state, the juvenile court can simultaneously impose a juvenile disposition and an adult sentence for certain offenses. The adult sentence is stayed on the condition that the juvenile offender complies with the provisions of his juvenile disposition. If the juvenile does violate the conditions of his juvenile disposition or commits a new offense, the juvenile court can execute the adult sentence. But if the offender does successfully complete his juvenile disposition, he is released at the age of twenty one and the adult sentence is removed. *See* Del Carlo, *supra,* at 1246–48. States such as Connecticut and Montana follow similar procedures. *See State Responses to Serious and Violent Juvenile Crime,* at pp. 12–14.

{32} These are some of the options that could fill the gap that cases such as this one expose in our system and that could eliminate the dilemma faced by the court below. Additionally, we note that some states have extended the jurisdiction of the juvenile court to age twenty five. *See State Responses to Serious and Violent Juvenile Crime,* at pp. 15. Despite the advisability of considering whether other states have adopted better ways of dealing with violent juvenile offenders, the decision to move toward such alternatives is fundamentally a policy-based decision for our Legislature. *See Green,* 502 S.E.2d at 829 (" 'We may not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved.... In a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people.' ") (quoting *Gregg v. Georgia,* 428 U.S. 153, 175, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (internal quotation

marks and citation omitted)). While we do not intend to suggest that the failure to provide such sentencing alternatives amounts to an unconstitutional sentencing scheme, we would be remiss if we did not urge our legislature to consider some of the flexible sentencing alternatives summarized above.

*Withdrawal of Guilty Plea*

{33} Aside from challenging the constitutionality of his sentence, Defendant also attacks the district court's refusal to set aside his guilty plea. Defendant argues that he should be allowed to withdraw his guilty plea because it is an illegal plea that was tainted by ineffective assistance of counsel. Based on the record before us, we cannot say that the district court abused its discretion in refusing to set aside Defendant's plea. *See State v. Jonathan B.,* 1998–NMSC–003, ¶ 7, 124 N.M. 620, 954 P.2d 52 (stating that refusal to allow withdrawal of guilty plea is reviewed for an abuse of discretion).

{34} Defendant's attack on the validity of his guilty plea relies heavily on the fact that, at the time of the plea, everyone concerned, including defense counsel and the district court, misconstrued the applicable law and misunderstood the potential maximum sentence faced by Defendant. As noted above, in a prior appeal we reversed Defendant's first sentence because the district court incorrectly sentenced Defendant as an adult for crimes committed prior to July 1, 1996, while Defendant was still fourteen years old. Defendant argues that the validity of his plea should be viewed with some skepticism because the person charged with advising him on whether to plead guilty was unaware of the applicable law. Likewise, Defendant is critical of the district court's efforts to ensure that Defendant's plea was knowing, voluntary, and intelligent given that the district court was also mistaken as to the applicable law. Nevertheless, based on the arguments advanced by Defendant on appeal, we see no basis in this record for requiring that Defendant be allowed to withdraw his plea.

{35} We disagree with Defendant's suggestion that his plea was invalid because he did not know the correct maximum penalty that he faced at the time of his

plea. A criminal defendant should only be allowed to withdraw his plea when he is not adequately notified of the material consequences of the plea and such information is relevant to the decision to enter into the plea in the first place. *See State v. Lozano*, 1996–NMCA–075, ¶ 18, 122 N.M. 120, 921 P.2d 316. Although Defendant was misinformed that he could be sentenced as an adult for all of the charges to which he pled guilty, the incorrect information that Defendant received did not render his plea invalid because Defendant was actually advised that he could be sentenced to a longer term of adult incarceration than he actually faced or ultimately received. *See Jonathan B.*, 1998–NMSC–003, ¶ 17, 124 N.M. 620, 954 P.2d 52 (holding that failure to accurately advise defendant of potential penalties does not render plea involuntary and unknowing if defendant suffers no prejudice by receiving sentence less than maximum possible sentence represented by the State or the court).

{36} Defendant also asserts that his plea is invalid on its face because it contemplates an illegal sentence, and as such, should not be allowed to stand. Without deciding whether a plea that contemplates an illegal sentence must be set aside, we simply note that the actual text of Defendant's plea and disposition agreement did not mandate entry of any particular sentence, much less an illegal sentence. Indeed, by his plea and disposition agreement, Defendant simply agreed to plead guilty to most of the charges against him in exchange for the State's agreement to dismiss one of the charges. Sentencing discretion was left with the court, and the plea agreement specifically stated that Defendant would argue for a juvenile disposition and the State would argue for adult sanctions. In short, the record does not support Defendant's contention that the plea, on its face, contemplated an illegal sentence.

{37} Although the plea agreement itself may not have provided for an illegal sentence, we are not unmindful of the fact that Defendant's attorney misunderstood the applicable law at the time that he advised Defendant to plead guilty. Because Defendant's trial attorney failed to identify the applicable law, and consequently failed to accurately advise Defendant of the true maximum sentence he faced, Defendant argues the district court should have set aside his plea as the product of ineffective assistance of counsel. The State suggests that Defendant should not be allowed to withdraw his plea because this Court did not permit Defendant to withdraw his plea following his first appeal. While we rejected Defendant's claim of ineffective assistance of counsel raised in his first appeal, we did so because there was no evidentiary record to show that Defendant would have entered a different plea had counsel been aware of the correct law at the time of the plea. Accordingly, we concluded that Defendant had failed to establish a prima facie case of ineffective assistance of counsel. *See State v. Swavola*, 114 N.M. 472, 475, 840 P.2d 1238, 1241 (Ct.App. 1992). But since we remanded Defendant's case for resentencing as a result of his first appeal, Defendant was able to develop a limited evidentiary record to support his claim of ineffective assistance of counsel. As such, Defendant is not precluded from reasserting his claim of ineffective assistance of counsel to the extent that it is supported by the record developed on remand during his motion to set aside the plea.

{38} "Effective assistance of counsel is necessary during plea negotiations because the most important decision for a defendant in a criminal case is generally whether to contest a charge or enter into a plea agreement." *Patterson v. LeMaster*, 2001–NMSC–013, ¶ 16, 130 N.M. 179, 21 P.3d 1032. *Patterson* also noted that " '[i]n the plea bargain context a defendant must establish that his counsel's performance was objectively unreasonable and that but for counsel's errors, he would not have pleaded guilty and instead gone to trial.' " *Id.*, ¶ 18 (quoting *United States v. Martinez*, 169 F.3d 1049, 1052–53 (7th Cir.1999)). In this regard, "[t]he question is whether 'there is a reasonable probability' that the defendant would have gone to trial instead of pleading guilty or no contest had counsel not acted unreasonably." *Patterson*, 2001–NMSC–013, ¶ 18, 130 N.M. 179, 21 P.3d 1032.

{39} Within the context of this case, we have little trouble concluding that

the performance of Defendant's trial attorney was objectively unreasonable given that his trial attorney testified at the hearing on the motion to set aside the plea that he was unaware of the applicable law at the time that he advised Defendant to plead guilty. *See In re Neal,* 2001–NMSC–007, ¶ 21, 130 N.M. 139, 20 P.3d 121 ("No lawyer should approach any task without knowledge of the applicable statutes, court rules, and case law...."). But even though defense counsel's performance may have been objectively unreasonable, Defendant must still demonstrate a reasonable probability that he would have gone to trial instead of pleading guilty had his attorney not acted unreasonably. With that standard in mind, the district court could reasonably have found that Defendant would not have decided to go to trial even had his attorney properly advised him of the actual sentence that he faced.

{40} Defendant's trial attorney testified that he would have never counseled Defendant to plead to an illegal sentence had he known what the law was at the time of the plea. Even though that testimony was uncontradicted, we do not believe the district court abused its discretion in rejecting trial counsel's testimony given that the plea itself did not agree to an illegal sentence. Moreover, Defendant's trial attorney testified that he originally decided to counsel a plea to virtually all of the charges because he believed Defendant had a good chance of receiving a juvenile disposition by establishing his amenability to treatment. As such, the trial court could have discounted trial counsel's claim that he would have advised Defendant to go to trial had he known the true state of the law.

{41} We should also note that during the course of the hearing on Defendant's motion to set aside the plea, the district court appeared suspicious of the claim that Defendant would not have pleaded guilty had he known that he only could be sentenced as an adult on six counts instead of thirteen. The district court remarked that it seemed illogical for Defendant to contend that he would not have pleaded guilty had he known he was facing a maximum sentence of 91½ years even though he actually did plead no contest

when he thought he was facing a sentence of 185 years. In the face of this apparent contradiction, trial counsel suggested that he might have considered going to trial on fewer charges because he had thought he could successfully defend against some of the charges. Despite defense counsel's claim, he did not specify the substance of such a defense and did not indicate to which charges he would have had defenses. In light of this underdeveloped state of the record, we cannot say that the district court abused its discretion by refusing to set aside the plea for ineffective assistance of counsel. And given the lack of a record with regard to this aspect of Defendant's ineffective assistance of counsel claim, we do not believe that Defendant has established a prima facie case of ineffective assistance of counsel that would warrant a remand to further develop the record on this point. *See Swavola,* 114 N.M. at 475, 840 P.2d at 1241.

## CONCLUSION

{42} We affirm the judgment and sentence.

{43} **IT IS SO ORDERED.**

I CONCUR: CELIA FOY CASTILLO, Judge.

RICHARD C. BOSSON, Chief Judge (specially concurring).

BOSSON, Chief Judge (specially concurring).

{44} Although the law weighs in favor of affirming Joel's sentence, I have substantial concerns regarding a system that imposes long term, adult sentences on children without affording judges the tools necessary to make sound, informed decisions.

{45} According to the record, the earliest Joel can expect to be considered for parole is after serving a sentence of forty-five years. For one so young, this is effectively a life sentence. One who goes into prison a teenager and comes out a man at the age of retirement has forfeited most of his life.

{46} A sentence of ninety years, for acts committed while Joel was fourteen and fifteen years old, is likely one of the longest

sentences ever imposed on one so young in the modern history of this state. *See State v. Gonzales*, 2001–NMCA–025, ¶ 5, 130 N.M. 341, 24 P.3d 776 (affirming twenty-two-year adult sentence where the defendant pleaded guilty to second degree murder, aggravated burglary, aggravated battery, and two counts of aggravated assault); *In re Ernesto M.*, 1996–NMCA–039, ¶¶ 1–2, 121 N.M. 562, 915 P.2d 318 (Ct.App.1996) (affirming thirty year adult sentence for seventeen year old, who had raped, beaten, and kidnapped a convenience store clerk). And this was not even a murder case. If Joel had eventually killed his victim, perhaps to protect himself from prosecution for his other crimes, he could have received a life sentence as an adult, but would have become eligible for parole after a "mere" thirty years. Thus, although Joel commits crimes which, however gruesome, are less than first degree murder, he receives a sentence that is effectively fifty percent longer. *See Coker v. Georgia*, 433 U.S. 584, 598, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (stating that rape, although a serious crime, does not compare with the unjustified taking of a human life and is to be treated differently than murder in conducting a proportionality analysis).

{47} The problem with this sentence lies not just with the number of years, but more importantly with the process that seemingly made this sentence inevitable. As I read the record below, it was as much the lack of sentencing alternatives, as the particular merits of Joel's circumstances, that compelled this sentence. The Children's court judge was put in a classic dilemma. If he wanted to afford Joel a reasonable chance to redeem himself, the judge had to put society at risk. If the judge sentenced Joel as a juvenile, Joel would go free at age twenty-one, regardless of whether or not he proved to be truly amenable to rehabilitation. If, on the other hand, the judge wanted to maximize the protection of society, the judge had to assume the worst—that Joel was not amenable to treatment and rehabilitation as a juvenile—and sentence him then, and forevermore, as an adult. Although, in a technical sense, the court could choose its sentence, the harsh reality of our flawed system made it a Hobson's choice. The court essentially had no choice but to protect society at the expense of the child.

{48} The judge was not insensitive to this dilemma. At the final sentencing hearing, the court characterized its role as that of "a judge searching for options." Yet, he recognized the effective lack of any such options, thanks to the faulty amenability process. The judge emphasized the need for "a system that would allow us to experiment and protect the community at the same time," a decision that the court "dearly wish[ed he] could make ... in this case." Instead, the judge had "to make a prediction [now] ... as the only decision I'll get a chance to make." Forcing the judge to make that decision now meant that, in order to protect society, he had no choice but to sentence Joel as an adult and, in the court's own words (concurring in defense counsel's characterization), "throw away the child." The court was brutally frank in its reasoning. The sentence was ninety years so that, even with the possibility of meritorious time reductions and parole eligibility, Joel will not leave prison until he is at an age when, biologically speaking, he will be too old a man to pose a serious threat of re-offending. The court regretfully concluded, "I take no joy at all in finding that [this] is the only option I have."

{49} I enthusiastically join that portion of the majority opinion that calls for improvements in the Children's Code. Children's court judges need more flexible tools in order to adequately address the unique problems presented by youthful offenders. Judges need the power to sentence juveniles conditionally, first as juveniles and later as adults, depending upon whether subsequent review indicates that adult sentencing is warranted. With conditional sentencing, courts could take advantage of the therapeutic and rehabilitative services that are uniquely available for juveniles, and would have the opportunity to observe how a child actually performs until turning twenty-one. When the juvenile became of age, the judge would have a record of performance upon which to base a more informed, predictive decision about the probability for success versus the risk to society. Conditional sentencing affords the juvenile one last opportunity for redemption,

while retaining institutional control over the juvenile for the protection of society; this seems to be a win-win proposition.

{50} New Mexico, unfortunately, does not have such a system in place. Instead, we ask the impossible of our Children's court. We expect judges to make life-long, predictive decisions, without the possibility of later review, about the kind of adults these juveniles will turn out to be, twenty, thirty, and forty years into the future. We do not, however, equip our judges with adequate and timely information to make such decisions as informed as they could be.

{51} We demand that judges determine, now, whether a child is "amenable to treatment or rehabilitation as a child in available facilities," pursuant to NMSA 1978, Section 32A–2–20(B)(1) (1996). We do not, however, afford judges the opportunity to experiment, under controlled conditions, to see how a child actually responds to treatment. Thus, the amenability determination is fraught with risk and, as a practical matter, forces judges to err on the side of caution in making amenability decisions. A lot rides on the wisdom of these amenability decisions. In the interest of protecting society, judges have to assume the worst about a juvenile, which can translate into a lengthy adult sentence on the chance that a juvenile may re-offend. And let us not forget that, under the present system, sixteen-year-old boys, once they are deemed not "amenable" to rehabilitation in juvenile facilities, serve lengthy adult sentences in the company of full-grown and very dangerous men. *See generally* Martin Forst, Jeffrey Fagan & T. Scott Vivona, *Youth in Prisons and Training Schools: Perceptions and Consequences of the Treatment–Custody Dichotomy,* 40 Juv. & Fam. Ct. J. 1, 9 (1989) (stating that juveniles in adult prisons are particularly vulnerable to being made victims).

{52} Thus, in my mind, the process that compelled this ninety-year sentence is what makes its severity in this case so suspect. *Cf. Hicks v. Oklahoma,* 447 U.S. 343, 343, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980) (holding that it violates due process of law for a convicted state prisoner to be sentenced under a mandatory punishment statute where,

under state law, he was entitled to the benefit of a discretionary state sentencing statute); *Willeford v. Estelle,* 637 F.2d 271, 272 (5th Cir.1981) (remanding for post-conviction relief where defendant, under state law, should have been entitled to an exercise of discretion in sentencing by the trial judge, who had erroneously believed that he was statutorily bound to impose a sentence of life imprisonment). It is not that the punishment does not fit the crime in the abstract. It is that the punishment exceeds the crime in the particular context of compelling a judge to act out of fear; to impose upon a child the worst possible sentence, instead of a sentence based upon what the court felt the child truly deserved. "The inquiry focuses on whether a person *deserves* such punishment, not simply on whether punishment would serve a utilitarian goal." *Rummel v. Estelle,* 445 U.S. 263, 288, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980) (Powell, J., dissenting, joined by Brennan, Marshall, & Stevens, JJ.) (emphasis added).

{53} Defendant's status as a juvenile makes this flawed process all the more suspect in a constitutional sense. It is generally a tenet of constitutional law that children merit special consideration in assessing whether a punishment is cruel and usual under the Constitution. *See, e.g., Thompson v. Oklahoma,* 487 U.S. 815–16, 838, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) (holding that it constitutes cruel and unusual punishment to sentence a fifteen-year-old to death, and stating that "less culpability should attach to a crime committed by a juvenile than to a comparable crime committed by an adult"). Youthfulness goes into assessing the overall culpability of a defendant, which, in turn, is a factor in evaluating the proportionality of a punishment vis a vis a particular crime committed by a particular youthful offender. *See Eddings v. Oklahoma,* 455 U.S. 104, 115 n. 11, 116, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (noting that the age of a minor is a "relevant mitigating factor of great weight" in death penalty cases, and noting that "adolescents, particularly in the early and middle teen years, are more vulnerable, more impulsive, and less self-disciplined than adults ... [and] deserve less punishment because adolescents

may have less capacity to control their conduct and to think in long-range terms than adults" (internal quotation marks and citation omitted)). What might be proportional for an adult is not necessarily proportional for a child. *See generally* Wayne A. Logan, *Proportionality and Punishment: Imposing Life Without Parole on Juveniles,* 33 Wake Forest L.Rev. 681, 723 (1998) (arguing that the age of a juvenile should serve as a trigger for a heightened proportionality analysis, taking into account the background and traits of a young offender in the determination of criminal culpability).

{54} The Children's Code, unlike adult sentencing codes, requires us first to consider whether the defendant is amenable to rehabilitation; this is because, constitutionally speaking, kids are different. "[O]ur courts are especially solicitous of the rights of juveniles." *State v. Hunter,* 2001–NMCA–078, ¶ 12, 131 N.M. 76, 33 P.3d 296. The Children's Code balances the needs of the child with the needs of society in ways that the adult criminal code and its courts do not. *See* NMSA 1978, § 32A–1–3(A) (1999) (stating that the purpose of the Children's Code is to make the child's health and safety "the paramount concern"); § 32A–2–20(D) (providing that, even where a child is sentenced as an adult, such a sentence may be "less than, but shall not exceed, the mandatory adult sentence"); *State v. Javier M.,* 2001–NMSC–030, ¶¶ 25, 33, 39, 131 N.M. 1, 33 P.3d 1 (concluding that the legislature intended to provide children with greater constitutional protections during investigatory detention than that afforded to adults); *In re Francesca L.,* 2000–NMCA–019, ¶¶ 8–9, 12–13, 128 N.M. 673, 997 P.2d 147 (affirming suppression of statements where it was unclear if juvenile had voluntarily waived rights, and noting that the legislature intended children to be treated differently and afforded more protection). Under our law, not all youthful offenders are sentenced as adults, but only those "not amenable to treatment or rehabilitation as a child in available facilities." Section 32A–2–20(B)(1). Before requiring judges to make a decision of such consequence, we owe it to the court, to the victim, to the juvenile, and to society as a whole, to inform these decisions as much as practica-

ble. Conditional sentencing, subject to later review, would make those decisions infinitely more informed than our present system.

{55} Regrettably, I must concur in affirming Joel's sentence, because existing constitutional authority gives me no choice. It ought to be different, and if it were in my power, I would elect to make it different. Suffice it to say that I concur with grave reservations about the lack of alternatives that make this sentence inevitable.